**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:24-CR-489-MTS-SPM |
| v. | ) | |
| | ) | Hon. Shirley P. Mensah |
| SIDARTH CHAKRAVERTY (1)-(3), et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS INDICTMENT FOR**
**FAILURE TO STATE AN OFFENSE ON GROUNDS OF MATERIALITY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

ARGUMENT ................................................................................................................. 7

    I.    The City of St. Louis Could Not Constitutionally Increase Defendants' Tax Bills Based on the Race or Sex of Their Business Partners. ......................... 8

        1.    The Race-Based Classifications Contemplated in St. Louis's W/MBE Program Could Not Survive Strict Scrutiny................................ 8

        2.    The Sex-Based Classifications Contemplated in St. Louis's W/MBE Program Could Not Survive Intermediate Scrutiny. ................. 11

    II.    Because the City Could Not Have Attached Constitutional Weight to the Race or Sex of Defendants' Business Partners in Deciding Whether to Award Tax Benefits, the Government Cannot Show that Representations Related to Race- and Sex-Based Preferences Were Material. ............................ 13

CONCLUSION ............................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Behav. Interventions v. Mo. Off. of Admin.*,
　No. 04-0872CVWGAF, 2005 WL 1182379 (W.D. Mo. May 17, 2005)..................................9

*City of Richmond v. J.A. Croson Co.*,
　488 U.S. 469 (1989) (plurality opinion) ...........................................................................9, 10

*D.M. by Bao Xiong v. Minn. State High Sch. League*,
　917 F.3d 994 (8th Cir. 2019) ...............................................................................................12

*Grutter v. Bollinger*,
　539 U.S. 306 (2003)..............................................................................................................11

*Kohlbek v. City of Omaha*,
　447 F.3d 552 (8th Cir. 2006) ...............................................................................................10

*Kousisis v. United States*,
　145 S. Ct. 1382 (2025).................................................................................................. *passim*

*Miss. Univ. for Women v. Hogan*,
　458 U.S. 718 (1982)..............................................................................................................12

*Neder v. United States*,
　527 U.S. 1 (1999).................................................................................................................13

*Nuziard v. Minority Bus. Dev. Agency*,
　721 F. Supp. 3d 431 (N.D. Tex. 2024) ................................................................................10

*Shelley v. Kramer*,
　334 U.S. 1 (1948).................................................................................................................13

*Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*,
　345 F.3d 964 (8th Cir. 2003) ...........................................................................................9, 11

*Students for Fair Admission, Inc. v. President and Fellows of Harvard College*,
　600 U.S. 181 (2023).....................................................................................................1, 8, 9, 10

*United States v. Baxter*,
　127 F.4th 1087 (8th Cir. 2025) ..............................................................................................7

*United States v. Covington*,
　395 U.S. 57 (1969)..................................................................................................................7

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*United States v. Hughson*,
   488 F. Supp. 2d 835 (D. Minn. 2007)......................................................................3

*United States v. Luna*,
   968 F.3d 922 (8th Cir. 2020) ................................................................................13

*United States v. McKee*,
   68 F.4th 1100 (8th Cir. 2023) .................................................................................3

*United States v. Polychron*,
   841 F.2d 833 (8th Cir. 1988) ..................................................................................7

*United States v. Steffen*,
   687 F.3d 1104 (8th Cir. 2012) ..............................................................................13

*United States v. Virginia*,
   518 U.S. 515 (1996)........................................................................................11, 12

*Universal Health Servs., Inc. v. United States*,
   579 U.S. 176 (2016).................................................................................................2

*Vitolo v. Guzman*,
   999 F.3d 353 (6th Cir. 2021) ................................................................................10

*Wengler v. Druggists Mut. Ins. Co.*,
   446 U.S. 142 (1980)...............................................................................................12

**Statutes**

Mo. Rev. Stat. § 99.310 .............................................................................................3, 4

Mo. Rev. Stat. § 99.450(1).............................................................................................4

**Other Authorities**

City of St. Louis, https://www.stlouis-
   mo.gov/government/departments/sldc/boards/Land-Clearance-for-
   Redevelopment-Authority.cfm (last visited July 13, 2025)....................................3

Exec. Order 14151, 90 FR 8339 (Jan. 20, 2025) ............................................................7

Exec. Order 14173, 90 FR 8633 (Jan 21, 2025) .............................................................7

Land Clearance for Redevelopment Authority, https://www.stlouis-
   mo.gov/government/departments/sldc/boards/Land-Clearance-for-
   Redevelopment-Authority.cfm (last visited July 13, 2025)....................................4

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

North Grand Blvd./Natural Bridge Ave./North Florissant Ave./Cass Ave./Dr.
   Martin Luther King Kr. Area (November 1, 2023),
   https://static1.squarespace.com/static/6305122c31f5ab77efbee9b8/t/
   6542bb5dc6b11d5f4c699797/1698872161389/Attachment+B+part+2++Chapt
   er+99+Redevelopment+Plan+Exhibit+DSmaller.pdf .................................................................4

Restatement (Second) of Contracts § 162, Comment c .................................................................15

St. Louis Development Corporation, *About Us*,
   https://www.developstlouis.org/about (last visited June 26, 2025) .........................................4

# INTRODUCTION[1]

Adoption of the Fourteenth Amendment reflected "a 'foundational principle'—'the absolute equality of all citizens of the United States politically and civilly before their own laws.'" *Students for Fair Admission, Inc. v. President and Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181, 201 (2023) (citation omitted). Under the Equal Protection Clause, government entities may not discriminate amongst their citizens on the basis of race, sex, or any other suspect classification. *See id.* at 223 ("[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" (citation omitted)). That fundamental principle of equality decides this case.

The government's prosecution rests on a local ordinance that clearly would violate the Equal Protection Clause if it were actually enforced. The indictment alleges that Defendants made false representations to a local government entity about the race or sex of some of their business partners, and that if that local government entity had known the *true* race or sex of those business partners, it would have charged Defendants' businesses higher taxes. Under the Equal Protection Clause, however, it would be patently unconstitutional for a local government to impose higher taxes on the basis of race or sex—*e.g.*, taxing Asian Americans more heavily than African Americans, or taxing men more heavily than women. As a matter of law, therefore, Defendants' representations about the race and gender of their business partners cannot have been relevant to

---

[1] Defendants maintain that the entire indictment should be dismissed based on the government's inability to show its alleged false statements were material. Should the Court not dismiss the indictment on these grounds, Defendants will file a Motion to Strike certain allegations from the Indictment. A ruling granting this Motion to Dismiss would moot Defendants' Motion to Strike, but Defendants preserve their right to file a Motion to Strike pending a ruling on this Motion to Dismiss. Because Defendants do not know what allegations, if any, will remain following the Court's ruling on this Motion to Dismiss, they are unable to file their Motion to Strike at this time.

their tax bills.  And because the crimes alleged in the indictment require the government to prove that Defendants' allegedly false statements were *material*, that legal irrelevance means that the government's charges—all of them—necessarily fail.

The law is clear, and Justice Thomas recently made exactly this point in his recent concurrence in *Kousisis v. United States*, 145 S. Ct. 1382 (2025).  Like Defendants here, the defendants in *Kousisis* were charged under the federal wire-fraud statute with making false representations about the demographics of their business partners.  Although the *Kousisis* defendants had not preserved the issue (and the full Court accordingly did not address it), Justice Thomas explained that it was unlikely that representations about a business partner's race or gender could ever be material to the government's decision about whether to award a particular benefit.  *See id.* at 1400-05.  Among other things, Justice Thomas observed that "[i]t is implausible to think that a '"reasonable person"' would '"attach importance"' to contract provisions that mandate constitutional violations."  *Id.* at 1404 (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 n.5 (2016)).  That reality, Justice Thomas warned, "may doom the Government's prosecutions in DBE [Disadvantaged Business Enterprises] cases where materiality is contested."  *Id.* at 1404.

This is just such a case.  Functionally, the race- and sex-based program here is no different than the program at issue in *Kousisis*.  It therefore would have been just as unconstitutional to rely on the statements about the race or sex of counterparties in awarding government benefits here as Justice Thomas suggested it was there.  And because "[i]t is implausible to think that a reasonable person would attach importance to . . . provisions that mandate constitutional violations," *Kousisis*, 145 S. Ct. at 1404 (citation and internal quotation marks omitted), the government as a matter of law cannot establish that the statements were material under 18 U.S.C. § 1343.  The government

cannot have it both ways—criticizing as unconstitutional race-based and sex-based programs while at the same time bringing this prosecution to enforce such a program. For that reason, the Court should dismiss the indictment in its entirety.

## BACKGROUND

The City of St. Louis ("City") has spent decades attempting to incentivize urban redevelopment.[2] Those efforts are the backdrop to this case and a fatal weakness in the government's prosecution.

As early as 1951, the City announced its concern regarding the "insanitary, blighted, deteriorated and deteriorating areas which constitute a serious and growing menace injurious to the public health, safety, morals and welfare of the residents of the state." Mo. Rev. Stat. § 99.310. The City observed that these blighted areas "contribute[] substantially and increasingly to the spread of disease and crime," the ramification of which was "beyond remedy and control solely by regulatory process in the exercise of the police power." *Id.* As a result, the City adopted measures to address blighted areas, affording "maximum opportunity . . . to the rehabilitation or redevelopment or renewal of areas by private enterprise." *Id.*

In response, the City began numerous initiatives aimed at redevelopment. First, the City created the Land Clearance for Redevelopment Authority ("LCRA"). The LCRA is a development board that oversees public and private real estate development in the City.[3] The City founded

---

[2] The Eighth Circuit has taken judicial notice of dispositive facts in granting motions to dismiss indictments before. *See, e.g., United States v. McKee*, 68 F.4th 1100, 1109 (8th Cir. 2023). Moreover, "it is permissible, and even desirable in certain circumstances, for the Court to examine the factual predicates of an Indictment, particularly where material facts are undisputed, in order to ascertain whether the elements of the criminal charge can be shown." *United States v. Hughson*, 488 F. Supp. 2d 835, 841 (D. Minn. 2007).

[3] "Land Clearance for Redevelopment Authority," City of St. Louis, https://www.stlouis-mo.gov/government/departments/sldc/boards/Land-Clearance-for-Redevelopment-Authority.cfm (last visited July 13, 2025).

LCRA with the goal of encouraging and facilitating the renewal of blighted areas through the regulatory process. Mo. Rev. Stat. § 99.310. Specifically, the LCRA performs blighting studies that provide an assessment of vacant and unoccupied parcels of land, and reviews and approves development proposals that include requests for public assistance in the form of tax abatement or tax-exempt revenue bonds.[4]

The City also formed the St. Louis Development Corporation ("SLDC"), an independent economic development agency that "exists to empower, develop and transform St. Louis."[5] SLDC also reviews proposals for redevelopment projects in the City and makes recommendations to the Board of Alderman and the Mayor regarding requests for tax incentives. Indictment ¶ 5. SLDC helped facilitate countless redevelopment projects, transferring blighted areas "for residential, recreational, commercial, industrial or other uses or for public use in accordance with the redevelopment plan." Mo. Rev. Stat. § 99.450(1).

Defendants Sid Chakraverty and Vic Alston sought to participate in redevelopment projects with the City. Mr. Chakraverty and Mr. Alston are brothers who co-own several successful real estate development and construction companies. They employ hundreds of Missourians in pursuit of a shared mission to bring world-class, affordable buildings to blighted areas in the City.

In September 2019, Defendants entered into an agreement with the City to address blight. Defendants contracted to undertake land clearance projects for the 5539-5551 Pershing Avenue

---

[4] *See, e.g.*, Land Clearance for Redevelopment Authority, Blighting Study for the North Grand Blvd./Natural Bridge Ave./North Florissant Ave./Cass Ave./Dr. Martin Luther King Kr. Area, (November 1, 2023), https://static1.squarespace.com/static/6305122c31f5ab77efbee9b8/t/6542bb5dc6b11d5f4c699797/1698872161389/Attachment+B+part+2++Chapter+99+Redevelopment+Plan+Exhibit+DSmaller.pdf; Land Clearance for Redevelopment Authority, https://www.stlouis-mo.gov/government/departments/sldc/boards/Land-Clearance-for-Redevelopment-Authority.cfm (last visited July 13, 2025).

[5] St. Louis Development Corporation, *About Us*, https://www.developstlouis.org/about (last visited June 26, 2025).

Redevelopment Area, agreeing to "redevelop the Redevelopment Area into an approximately 149-unit new construction multi-family apartment building," known as the Chelsea. Ex. A at 2 (Chelsea Redevelopment Agreement, Sept. 24, 2019). The Redevelopment Agreement concluded that the Chelsea was "in the best interest of the Redevelopment Area, The City of St. Louis, Missouri, and its residents," and that it furthered the City's ultimate objective: redevelopment. *Id.* at 2–3.

Less than a year later, Defendants entered into a second Redevelopment Agreement with the City. *See* Ex. B at 2 (SoHo Redevelopment Agreement, June 1, 2020). Defendants contracted with the City to "construct approximately 300 residential apartment units [the SoHo], approximately 5,600 square feet of retail space and an approximately 330-space parking garage" at 1501 South 7th Street Redevelopment Area. *Id.* Again, the Agreement emphasized that the redevelopment of the blighted area was in the "best interest" of the City, its residents, and the state of Missouri. *Id.* at 2–3.

The government does not take issue with Defendants' work on these redevelopment projects. The allegations do not concern the quality of Defendants' workmanship and materials, and the indictment does not dispute that Defendants' companies timely completed all the work they contracted with the City to perform. Rather, the indictment centers on the government's allegation that Mr. Chakraverty, Mr. Alston, and a third defendant, Ms. Shijing Cao, submitted inaccurate data to the City relating to the race and sex of some of the companies they worked with on those vital redevelopment projects. Specifically, the government alleges that Defendants overstated the extent of work performed by African-American-owned, Native-American-owned, and Women-owned subcontractors on the Chelsea and SoHo.

For the Chelsea project, the indictment alleges that Defendants "falsely represented and credited" the amount of material and labor purchased through one specific women-owned business ("WBE").[6] Indictment ¶ 14. Defendants allegedly did so by purportedly causing false information to be submitted to SLDC in various forms that incorrectly reported the amount paid to non-WBEs for materials and labor as having been paid instead to the WBE. *Id.* ¶¶ 15–18. The government further alleges that the inaccurate information led to SLDC's approval of the Chelsea project "for a property tax abatement as well as a sales tax exemption for the value of materials utilized in construction of the [building]." *Id.* ¶ 22.

The indictment makes similar allegations in relation to the SoHo project. The government contends that Defendants again overstated the amount of work performed by that same WBE, and that the Defendants also overstated the amount of work performed by an African-American-owned business and a Native-American-owned business. Indictment ¶¶ 29–34. The government claims that those inaccurate reports caused SLDC to approve a sales-tax exemption that it allegedly would not have approved if it had realized that the work was performed by a "Subcontinent Asian American"-owned business like Defendants'. *Id.* ¶ 23.

The critical problem for the government, and the insurmountable legal hurdle it faces, is that imposing additional tax burdens (or withholding tax benefits) based upon race or sex would clearly have violated the Equal Protection Clause. If the government proceeds forward with this prosecution premised on the City's right to do just that, it will be endorsing unconstitutionally discriminatory race-and sex-based programs in direct violation of President Trump's Executive

---

[6] As the indictment explains, Defendants' development and construction company, Big Sur, was itself a certified MBE, and thus its own reported labor and materials made up the majority of MBE participation on the first project at issue. Indictment ¶ 7. The indictment does not allege that Defendants made any false statements or misrepresentations to SLDC regarding their utilization of MBEs in order to meet SLDC's MBE participation goals on this project.

6

Orders. *See* Exec. Order 14151, 90 FR 8339 (Jan. 20, 2025); Exec. Order 14173, 90 FR 8633 (Jan 21, 2025).

## ARGUMENT

To withstand a motion to dismiss under Rule 12(b) of the Federal Rules of Criminal Procedure, an indictment "must allege that the defendant performed acts which, if proven, constitute the violation of law for which he is charged." *United States v. Polychron*, 841 F.2d 833, 834 (8th Cir. 1988). "If the acts alleged in the indictment do not constitute a violation of law, the indictment is properly dismissed." *Id.*; *see also United States v. Baxter*, 127 F.4th 1087, 1090 (8th Cir. 2025) (explaining that dismissal is appropriate "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense") (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

The government's indictment here flunks that test. An indictment for wire fraud under 18 U.S.C. § 1343 must allege, among other things, that a defendant made a "*material* misstatement*.*" *Kousisis*, 145 S. Ct. at 1388 (emphasis added); *see also Polychron*, 841 F.2d at 834. And as the government told the Supreme Court recently, "a misrepresentation is material" for purposes of the wire-fraud statute "only if it goes to the very essence of the parties' bargain." *Kousisis*, 145 S. Ct. at 1396 (citations and internal quotation marks omitted) (describing the government's preferred test for materiality under Section 1343). But far from going to the essence of the parties' bargain, the misrepresentations alleged here were immaterial as a matter of law: The indictment does not dispute that Defendants' businesses performed all of the construction and development work that they had agreed to perform, and it would have been unconstitutional for the City to increase the tax burden on Defendants' projects based just on the race or sex of the people who were involved in completing them. Thus, just as Justice Thomas anticipated, the government's W/MBE-focused indictment fails to assert all the essential elements of federal wire fraud and must be dismissed.

7

I.     **The City of St. Louis Could Not Constitutionally Increase Defendants' Tax Bills Based on the Race or Sex of Their Business Partners.**

Requiring developers like Defendants to discriminate based on race and sex in hiring subcontractors in order to obtain tax benefits clearly would violate the Equal Protection Clause of the Fourteenth Amendment.

1.     **The Race-Based Classifications Contemplated in St. Louis's W/MBE Program Could Not Survive Strict Scrutiny.**

The "core purpose of the Equal Protection Clause" is "doing away with all governmentally imposed discrimination based on race." *Students for Fair Admission, Inc. v. President and Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181, 206 (2023) (cleaned up). As the Supreme Court has made clear: "Eliminating racial discrimination means eliminating all of it." *Id.* Race-based classifications of any kind, then, "must survive a daunting two-step examination" known as "strict scrutiny," which requires that the classification: (1) "is used to 'further compelling governmental interests'"; and (2) "is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.* at 206–07 (citations omitted).

In light of those "daunting" standards, *SFFA*, 600 U.S. at 206, it would be plainly unconstitutional for the City of St. Louis to enforce a requirement of race-based preferences for subcontractor hiring as a condition for the receipt of tax benefits. To start, no compelling governmental interest exists here that could justify the use of exclusive race-based eligibility requirements. The Supreme Court "has long rejected the[] core thesis" that "the Fourteenth Amendment permits state actors to remedy the effects of societal discrimination," writ large, "through explicitly race-based measures." *SFFA*, 600 U.S. at 226. Accordingly, the Court has "repeatedly held that ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action." *Id.*; *see also id.* at 220 ("We have time and again forcefully

rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'") (citation omitted).

Where a government body seeks to "eradicate the effects of private discrimination within its own legislative jurisdiction," therefore, it must show that the government *itself* was—at minimum—"a 'passive participant' in a system of racial exclusion practiced by elements of the local . . . industry." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 491–92 (1989) (plurality opinion). In making that showing, generalized or unsupported assertions of discrimination do not suffice; the government must point to "specific, identified instances of past discrimination." *SFFA*, 600 U.S. at 207. And even when it has identified such past discrimination, the government also must "demonstrate a 'strong basis in the evidence' supporting its conclusion that race-based remedial action was necessary to further that interest." *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003). *See, e.g., Behav. Interventions v. Mo. Off. of Admin.*, No. 04-0872CVWGAF, 2005 WL 1182379, at *2 (W.D. Mo. May 17, 2005) (citation omitted) (emphasizing that it is the "[c]ourt's duty to note that a quota system, such as the one envisioned by the . . . M/WBE program, is inapt to narrowly tailor 'remedial relief to those who suffered the effects of prior discrimination' and, therefore, highly unlikely to survive a challenge under strict scrutiny").

St. Louis could not hope to meet those demanding requirements here. As part of the W/MBE program, the City published specific racial goals for the hiring of contractors and subcontractors. *See* Ex. C (Certification and Compliance Rules). The goals were as follows: 21% for African Americans, 2% for Hispanic Americans, 0.5% for Asian Americans, 0.5% for Native Americans, and 11% for women-owned businesses. *Id.* § II(B).

In considering the permissibility of race-based quotas in 2018, the City pointed to a "Disparity Study" suggesting that businesses owned by racial minorities were underrepresented among government contractors in St. Louis between 2007–2012. *See* Ex. D (Ordinance 70767), § 3(iii) at 7:8–22; Ex. E (Disparity Study). But as the Eighth Circuit has explained, "[e]stablishing a prima facie case of discrimination based simply on statistical evidence is difficult." *Kohlbek v. City of Omaha*, 447 F.3d 552, 557 (8th Cir. 2006). While a "significant statistical disparity" may support "an inference of discriminatory exclusion," *Croson*, 488 U.S. at 509, it is not, without more, enough to establish a "compelling governmental interest." *See, e.g., Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) ("Statistical disparities don't cut it" to establish an equal protection violation).

The insufficiency of the Disparity Study to support race-based preferences in connection with government tax benefits is particularly obvious in light of the study's own limitations. For one thing, the Disparity Study failed to identify any evidence showing that the government itself was an active or even passive cause of the identified disparities. *See* Ex. E (Disparity Study). By the time of the projects at issue here, the data used in the Disparity Study already was roughly a decade out of date. And critically, the Disparity Study focused only on contracts in which the government itself was the payor. *Id.*, Ch. 4-4–4-6. It provided no evidence of widespread race-based discrimination in the distinct context of subcontracting by private developers, and it failed to address projects utilizing government-funded incentives such as tax abatements. *Id.* § 3(iii)(a). As to the specific context relevant here (private subcontracts incentivized through tax abatements), therefore, the Disparity Study contains no "specific, identified instances of past discrimination" that could possibly support the enforcement of race-based contracting preferences. *SFFA*, 600 U.S. at 207; *see Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 480 (N.D. Tex. 2024)

10

(government "must identify the 'who, what, when, where, why, and how' of relevant discrimination").

Even if the City could point to strong evidence of past discrimination in the relevant context, and it cannot, it could not show that its use of race-based preferences is necessary to address that discrimination. *See Sherbrooke Turf*, 345 F.3d at 971 (citation omitted) (asking, in the context of race-based distinctions, whether "the means chosen to accomplish the government's asserted purpose are specifically and narrowly framed to accomplish that purpose"). Indeed, the Disparity Study identified extensive race-neutral measures that the City could adopt to address disparities potentially caused by "the City's contracting practices, policies, and procedures." Ex. E, (Disparity Study), Ch. 9-14–9-31. Before attempting to enforce race-based eligibility requirements, the City first would need to engage in "serious, good faith consideration of [those] workable race-neutral alternatives" and explain why it found them insufficient. *Sherbrooke Turf,* 345 F.3d at 972 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)). Yet there is no evidence that the City has found such alternatives insufficient, let alone that it has adequately explained the basis for that conclusion.

## 2. The Sex-Based Classifications Contemplated in St. Louis's W/MBE Program Could Not Survive Intermediate Scrutiny.

For similar reasons, the City clearly could not enforce sex-based preference requirements as a condition for developers' receipt of municipal tax benefits.

The Supreme Court has held that a government entity may maintain sex-based distinctions only where its "justification [for doing so] is 'exceedingly persuasive.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996). To successfully justify a classification based on sex, the government must show "at least that the challenged classification serves 'important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those

11

objectives.'" *Id.* at 533.  The government also must show that the members of the sex benefited by an otherwise discriminatory classification actually suffer a disadvantage related to the classification.  *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1002 (8th Cir. 2019).

Under that "demanding" legal standard, *Virginia*, 518 U.S. at 533, the enforcement of sex-based preferences in connection with the projects at issue here clearly would be impermissible for many of the reasons already addressed above in the discussion of race-based preferences.  Again, the use of data about the government's direct contracting practices between 2007–2012 would be insufficient to prove the existence of ongoing sex-based discrimination a decade later.  *See supra* p. 10; *see also D.M. by Bao Xiong*, 917 F.3d at 1002 (affirming preliminary injunction where rule prohibiting boys from participating on high school competitive dance teams did not survive intermediate scrutiny because data no longer showed underrepresentation for girls).  Again, that insufficiency is especially obvious because the Disparity Study did not focus on the contracting context actually at issue here—the hiring of subcontractors by private developers, rather than direct contracting by the City.  *See supra* p. 10; *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982) (invalidating statute that prevented men from enrolling in nursing school where state made no showing that women lacked opportunities in nursing field).  And again, there is no evidence that the City has found the sex-neutral alternatives identified in the Disparity Study ineffective at accomplishing its desired objectives.  *See supra*, p. 11; *see also Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151 (1980) (invalidating Missouri's worker compensation law that only required widower, not widow, to prove dependence on deceased spouse's earnings, as Missouri had not explored sex-neutral alternatives).

II.    **Because the City Could Not Have Attached Constitutional Weight to the Race or Sex of Defendants' Business Partners in Deciding Whether to Award Tax Benefits, the Government Cannot Show that Representations Related to Race- and Sex-Based Preferences Were Material.**

Consistent with the foundational principles articulated most recently in Justice Thomas's opinion in *Kousisis*, the fact that the City could not have constitutionally attached importance to the race or sex of Defendants' business partners means the government cannot make out a necessary element of its wire-fraud prosecution here.

"[M]ateriality of falsehood" is an element of the federal wire fraud statute. *Neder v. United States*, 527 U.S. 1, 25 (1999). In other words, to defraud someone, a defendant must make a "material, affirmative misrepresentations or active concealment of material information for the purpose of inducing action." *United States v. Luna*, 968 F.3d 922, 926 (8th Cir. 2020) (citing *United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012)). And as the Department of Justice recently acknowledged in the Supreme Court, "a misrepresentation is material" for purposes of the wire-fraud statute "only if it goes to the very essence of the parties' bargain." *Kousisis*, 145 S. Ct. at 1396 (citations and internal quotation marks omitted).

The government cannot demonstrate materiality here because, as a matter of law, the City could not have attached importance to representations regarding the race or sex of Defendants' subcontractors in a context where doing so would have violated the Equal Protection Clause of the Fourteenth Amendment. Put differently, any requirements relating to the race and sex of Defendants' subcontractors were necessarily unenforceable and therefore could not have "go[ne] to the very essence" of Defendants' bargain with the City. *Id.*; *see, e.g.*, *Shelley v. Kramer*, 334 U.S. 1, 20-21 (1948) (holding that, under the Fourteenth Amendment, courts may not enforce racially discriminatory contracts).

Describing the law, Justice Thomas made precisely this point in *Kousisis*, though the broader Court had no occasion to address it. Much like the government has alleged here, the *Kousisis* petitioners had entered into government contracts in which they represented that they would obtain project supplies from a Disadvantaged Business Enterprise ("DBE"), but then used the DBE as a pass-through entity and submitted false certifications regarding the true identity of their suppliers. 145 S. Ct. at 1389. But rather than dispute materiality, the petitioners there moved for acquittal on the distinct theory that the state agency had received the full economic benefit of its bargain and thus had not been defrauded of "money or property." *Id.* The Supreme Court rejected that theory, holding that the use of deceptive means to induce a business transaction can constitute wire fraud even if the defendant does not seek to cause economic loss. *See id.* at 1398.

Because the petitioners had not contested materiality on appeal, the Court as a whole did not address that element of the offense (beyond emphasizing that the materiality standard is "'demanding'" and thus imposes important limits on "the universe of actionable misrepresentations"). *Kousisis*, 145 S. Ct. at 1398. Justice Thomas, however, wrote separately to indicate that while he agreed with the Court's resolution of the actual question presented, he was "skeptical that petitioners' misrepresentations were material" under the standards applicable in criminal wire-fraud cases. *Id.* at 1399 (Thomas, J., concurring). In particular, Justice Thomas identified several reasons to "seriously doubt" that preferences based on race or gender could have gone "to the very '"essence of the bargain"'" between the petitioners and the state agency. *Id.* at 1400 (citation omitted).

Most pertinent here, Justice Thomas explained that complying with minority-hiring requirements under an explicitly race-based classification system likely was unconstitutional, and that it was "implausible to think that a reasonable person would attach importance to contract

14

provisions that mandate constitutional violations." *Id.* at 1404 (citation omitted) (cleaned up). "[I]f complying with the DBE provisions would violate the law," Justice Thomas observed, "it is difficult to see how representing such compliance 'would be likely to induce a reasonable person to manifest his assent.'" *Id.* (quoting Restatement (Second) of Contracts § 162, Comment c, at 441).[7]

That principle is dispositive here. Because it would have been plainly unconstitutional for the City to enforce race- and sex-based contracting preferences as a condition for the receiving of municipal tax benefits, representations related to the race and sex of Defendants' business partners could not have been material to the overall program of redeveloping blighted areas in St. Louis.

## CONCLUSION

For these reasons, Defendants Sidarth Chakraverty, Victor Alston, and Shijing Cao respectfully request that this Court dismiss the indictment with prejudice for failure to state an offense, and grant such other or further relief as this Court deems proper.

---

[7] Justice Thomas also made clear that materiality under the wire fraud statute is wholly separate from general defenses against claims of fraud and deceit. *Id.* at 1404 n.3. While recognizing case law holding that claims of unconstitutionality will not exclude voluntary fraud, Justice Thomas observed that "the question whether that unconstitutionality might contribute to *materiality* is distinct." *Id.* (emphasis added). Accordingly, had petitioners disputed materiality, "they might have been able to rely on the DBE provisions' unconstitutionality to support an argument that the provisions were not 'material' to their contracts." *Id.*

15

Dated: July 15, 2025

Respectfully submitted,

SIDARTH CHAKRAVERTY,

By:  /s/ Bradley J. Bondi
     Bradley J. Bondi (#465132 (D.C.))
     (*Pro Hac Vice Pending*)
     Benjamin W. Snyder (1020481 (D.C.))
     (*Pro Hac Vice Pending*)
     PAUL HASTINGS LLP
     2050 M Street NW
     Washington, D.C. 20036
     Telephone: 202.551.1700
     Facsimile: 202.551.0201

     Renato Mariotti (#6323198 (IL))
     PAUL HASTINGS LLP
     71 S. Wacker Dr., 45th Floor
     Chicago, IL 60606
     Telephone: 312.499.6005
     Facsimile: 312.499.6105

     *Attorneys for Defendant SIDARTH*
     *CHAKRAVERTY*

VICTOR ALSTON,

By:  /s/ Joel J. Schwartz
     Joel J. Schwartz (#39066 (MO))
     ROSENBLUM, SCHWARTZ, FRY & JOHNSON
     120 S. Central Avenue, Suite 130
     Clayton, MO 63105
     Telephone: 314.862.4332
     Facsimile: 314.862.8050

     *Attorney for Defendant VICTOR ALSTON*

SHIJING CAO,

By:  /s/ Vadim A. Glozman
     Vadim A. Glozman (#6315389 (IL))
     GLOZMAN LAW
     53 W. Jackson Blvd., Suite 1150
     Chicago, IL 60604
     Telephone: 312.726.9015
     vg@glozmanlaw.com

     *Attorney for Defendant SHIJING CAO*